IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | CASE NO. CR-13-017-RAW |
| v.  ) | |
| ) | |
| RAYMOND A. BARNES and  ) | |
| CHRISTOPHER A. BROWN  ) | |
| ) | |
| Defendants.  ) | |
| ) | |

_____

### UNITED STATES'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States, by and through its undersigned attorneys, files this sentencing memorandum to supplement the two sentencing memoranda it previously filed in response to Barnes and Brown's motions for variance in October 2014. (Docs. 208 and 215). For the reasons previously set forth and for the reasons set forth below, the United States respectfully requests this Court to sentence the defendants within the range of 70 to 87 months in federal prison in accordance with the United States Sentencing Guidelines.

**I.   Procedural History**

On February 13, 2013, a federal grand jury returned a four-count indictment against Raymond A. Barnes and Christopher A. Brown for crimes they committed as the Superintendent and Assistant Superintendent of the Muskogee County Jail (MCJ). Count One charged Barnes and Brown with conspiracy to violate the rights of inmates housed at MCJ by assaulting inmates who were restrained and compliant, or by ordering other jail employees to do so, in violation of 18 U.S.C. § 241 (Conspiracy Against Rights). Count One alleged seven overt acts that the

1

defendants committed in furtherance of the conspiracy. Counts Two and Three charged two of these overt acts as substantive civil rights offenses. Count Four charged Brown with violating 18 U.S.C. § 1001 (False Statement) for making false statements to the FBI, when contrary to the evidence that inmates were "thrown," "flung," and "yard-darted" to the ground, Brown claimed that inmates were "gently placed" on the ground once they were transported to MCJ.

On February 25, 2014, a jury returned verdicts of guilty as to all counts for Barnes. The jury returned guilty verdicts on Counts One, Two, and Four with regard to Brown. The jury acquitted Brown of Count Three, one of the substantive civil rights offenses.

On March 15, 2015, this court sentenced Barnes to one year in federal custody and Browns to six months in federal custody.

On July 27, 2016, the Tenth Circuit Court of Appeals reversed the sentences, finding them procedurally unreasonable. The Court upheld each count of conviction, and the Supreme Court subsequently denied Defendant Brown's petition for certiorari. The Court of Appeals remanded this matter for resentencing.

**II.    Factual Summary**

The evidence established, the jury found, and the Tenth Circuit affirmed that the defendants conspired to violate the civil rights of inmates at the MCJ by subjecting them to the use of physical force for the purpose of punishing them and deterring future insubordination, rather than for any legitimate law enforcement purpose. See United States v. Barnes and Brown, 2016 WL 3548373, *3 (10th Cir. June 27, 2016) (unpublished) (hereinafter Barnes), cert. denied, 2016 WL 4127430 (Oct. 3, 2016). The defendants carried out the conspiracy in two ways: by orchestrating gratuitous assaults on inmates as part of a process known as "Meet and Greets," and by inflicting gratuitous force on restrained and compliant inmates like Jeremy Armstead on

an ad hoc basis. As the Tenth Circuit found in upholding the convictions, "The only proffered justification for the force used against these inmates was to discourage future repetition of their alleged past bad behavior. Such punitive treatment does not serve a legitimate penological purpose." Barnes at *26.

"Meet and Greets" were the mechanism by which Barnes and Brown welcomed troublesome inmates from out-of-county facilities to MCJ. The defendants employed gratuitous violence to scare incoming "problem" inmates into behaving properly once they arrived at MCJ. During each "Meet and Greet," jail staff, at the behest or knowing acquiescence of the defendants, forcefully grabbed fully compliant and restrained inmates out of transport vehicles and threw them to the concrete ground, without the inmates having any ability to brace or protect themselves.

With one possible exception, Barnes and Brown were both present for all meet-and-greets described at trial, watching and condoning the assaults that occurred. Before Jace Rice's meet-and-greet, Barnes instructed Michael Gray, the deputy who would pull Rice from the transport vehicle, that "the first thing that touched the ground should be his head." Barnes at *3. Before Gary Torix's meet-and-greet, Kymberlie Shamblin, the medical supervisor, specifically cautioned Barnes and other jailers at the pre-arrival meeting to be careful because Torix had a previous head injury. Despite that warning, and egged on by Barnes's encouraging "Let's do it," numerous jailers described how Torix was yanked from the vehicle and slammed to the ground, with his chest, head, and face hitting the ground first. The evidence demonstrated that Brown personally participated in grabbing inmate Herbert Potts out of the transport vehicle and throwing him to the concrete, face-first. Barnes at *5. Potts, too, suffered a gash to the head. Riley Starr's meet-and-greet followed the same pattern: Starr arrived in the vehicle fully

3

restrained and non-threatening, yet jailers grabbed him from the vehicle by the arm, threw him to the ground, and then piled on top of him to change out his handcuffs and shackles.

The evidence proved that there was no legitimate or penological purpose for the assaults; rather, the purpose was to hurt the inmates so that they would know what was in store for them should they cause problems at MCJ in the future. After the assaults happened, the defendants endorsed them, with Barnes telling the inmates, "If you give us any problems, what just happened to you will happen to you again or even worse." See Barnes at *4-*5.  Barnes bragged about the meet-and-greets during officer training—as Deputy Ashley Wooten put it, "like he enjoyed the physical contact of the meet and greet" and "[t]hat the inmate was injured."

The trial demonstrated that the defendants conducted assaults outside the meet-and-greet context as well. Perhaps the most disturbing of these was the assault on inmate Jeremy Armstead. See Barnes at *6-7. On the day in question, Barnes approached Jeremy Armstead, an inmate standing calmly and compliantly on the medical hallway.  After verbally threatening Armstead, Barnes grabbed him by the neck or collar, pushed him up against the wall, and threw him back and forth between the walls, pushing him toward the elevator.  Armstead said nothing and did not resist.  While Brown aimed a taser at Armstead, Barnes and Brown handcuffed him and brought him down to a cell. Armstead suffered injury to and pain in his collar bone and shoulder. Id.

Evidence further established that Barnes and Brown created a culture of fear among MCJ staff by threatening or retaliating against employees if any attempted to report abusive behavior to the Sheriff or other outside authorities. Barnes stated at meetings that if jailers had a "problem," they needed to go to him, not the Sheriff.  He threatened employees with termination if they ever went over his head to report an incident.  Barnes required and encouraged jailers to

4

write incident reports that falsely justified the use of force or contained misleading or inaccurate accounts. See Barnes at *5-*6.

Specific examples of defendants' intimidation of and reprisals against detention officers who reported misconduct were described at trial. One jailer, Tonia Hardy, testified that Barnes and Brown retaliated against her twice after she submitted reports about jail staff mistreatment of an inmate. On one occasion, Barnes switched her shift from nights to days, which he knew would be a hardship for her because of childcare issues. On the second occasion, Brown changed her shift. Barnes at *7. After Barnes's assault on inmate Jeremy Armstead, then-Deputy Brandi Hoover visited Armstead in his cell. Barnes, accompanied by Brown, berated Hoover for giving Armstead the grievance form and threatened to demote her. At the next staff meeting, Barnes threatened jailers by saying that if he found out who had delivered the grievance form to the mail room, that person would be fired. In connection with the FBI's investigation of the MCJ, Barnes told Shamblin that when "all of this was over . . . everyone who talked to the FBI should be fired." Brown's own lie to the FBI, which formed the basis of his false-statement conviction, was a final link in the chain of abuse, intimidation, and concealment.

**III.    Argument**

A sentence within the Guidelines range of 70-87 months is appropriate, necessary, and just, adequately capturing the defendants' conduct. A sentence significantly below the Guidelines range would not meet the goals set forth by Congress, would be substantively unreasonable, and would sanction the gratuitous violence and abandonment of constitutional principles promoted by the defendants.

A. <u>The Factors Set forth in 18 U.S.C. 3553(a) Call for a Sentence within 70-87 Months</u>

A <u>Guidelines</u> sentence is sufficient, but not greater than necessary, to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2) because it adequately captures the seriousness of the defendants' offenses, promotes respect for the law, and provides a just punishment for the defendants' crimes.

Barnes and Brown were found guilty of conspiring to violate—and of violating—the rights of inmates in their custody. As the United States Supreme Court has recognized, the Sentencing Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." <u>Rita v. United States</u>, 551 U.S. 338, 350 (2007). There is nothing in the nature and circumstances of these serious offenses, which include physical abuse of inmates in their care and custody, or the defendants' personal characteristics, that justifies the sentences that this court initially imposed. Like many law enforcement officers convicted of violating 18 U.S.C. §§ 241 and 242, Barnes and Brown have no prior criminal histories and view termination of employment as punishment enough. Yet the <u>Guidelines</u> calculations for these defendants already take into account their lack of criminal histories by placing them into a criminal history category of I. Just like many law enforcement officers who willfully deprived individuals of their constitutional rights (see cases cited below), these defendants' crimes warrant significant prison sentences. If termination were enough, it would render criminal statutes moot – not only for law enforcement officers who commit crimes, but for any individual who uses their authority to commit crime during the course of his or her employment.

B.  The Circumstances of These Assaults Exacerbate, Not Diminish, Defendants' Culpability

The specific nature of the defendants' conduct in this case should result in a higher, not a lower sentence. The defendants' conduct in encouraging and condoning (and in Brown's case, participating in) the slamming of inmates' heads into the concrete at the meet-and-greets, and Barnes's gratuitous assault (with Brown's assistance) on Jeremy Armstead, were particularly vicious and calculated to cause pain and inflict serious injury.

Medical supervisor Kymberlie Shamblin specifically cautioned Barnes and other jailers at the pre-arrival meeting that Gary Torix had a preexisting head injury.  Barnes's response was to joke to jailers, "be sure and don't knock him into everything on your way in, something to that effect" and to egg them on with—"Let's do it".  Torix's resulting "nose dive" to the ground caused him to suffer lacerations across his forehead; he had "blood coming down his face" and was "actually dripping blood" as he was carried into the jail. Barnes's direction to the deputy pulling Jace Rice from the transport vehicle, that "the first thing that touched the ground should be his head," culminated in Rice suffering a knot, or red bump, on his head.  Herbert Potts, whom Brown personally grabbed from the vehicle, also suffered a gash to the head.  Head-first slams to the concrete of fully shackled inmates unable to brace themselves are quite serious offenses that inflict pain and threaten serious harm.  That no lasting injury resulted does not mitigate the offense.

The Eleventh Circuit Court of Appeal's decision in United States v. McQueen, 727 F.3d 1144 (11th Cir. 2013), is particularly instructive.  In that case, the trial court sentenced a sergeant, Alexander McQueen, to a 12-month prison term and a corrections officer, Steven Dawkins, to a 1-month prison term for a serious assault on several inmates—both sentences far below the advisory Guidelines ranges of 151-188 months for McQueen and 15-21 months for

7

Dawkins. The Eleventh Circuit held that the sentences were substantively unreasonable. Id. at 1157. "For starters," the court explained, "the sentences of McQueen and Dawkins completely fail to 'reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.'" Ibid. (quoting 18 U.S.C. 3553(a)(2)(A)). The Eleventh Circuit emphasized that a violation of 18 U.S.C. § 241 is "a particularly serious offense," ibid., and that "[t]he evils against which this civil rights statute is directed especially include correctional officers who flagrantly beat inmates . . . placed by the law in their charge," id. at 1158.

As with McQueen, Barnes and Brown were supervisors, a fact that federal courts have found makes a crime more—not less—egregious. See United States v. Wilson, 686 F.3d 868 (8th Cir. 2012) (upholding sentence of chief jail administrator to maximum 120-month term for overseeing and participating in the assaults of four inmates; the most egregious of which were committed at his behest, rather than by his own hands); Conatser, 514 F.3d 508 (6th Cir. 2008) (upholding life sentence of jail supervisor who oversaw but did not participate in beating death of inmate and a 108-month sentence for the officer who carried out the beating). Cf. United States v. Pagan-Ferrer, 736 F.3d 573, 593 (1st Cir. 2013) (holding that the defendant "cannot plausibly suggest that allowing his subordinates to repeatedly and violently assault a handcuffed suspect constituted anything other than an act of apparent unlawfulness and a clear violation of [the victim's] civil rights."); United States v. Budd, 496 F.3d 517 (6th Cir. 2007) (affirming conspiracy and deprivation of rights convictions for defendant who was second in command at local jail and was sentenced to 96 months in prison).

Defendant Brown has argued that he did not physically assault anyone or instruct them to do so and is therefore less culpable than other similarly situated defendants might be. The Tenth Circuit explicitly rejected that premise in its opinion in this case, saying, "That is simply not

8

true." Barnes at *21. The Court cited testimony from Brandi Hoover, Michael Gray, and others to show that Brown encouraged and engaged in physical assaults of unresisting inmates. The Court also found that "Brown took efforts to conceal his behavior by retaliating against those jail employees who honestly reported incidents involving use of force." Barnes at *26.

C. A Downward Departure or Variance is not Warranted Based on Defendants being Susceptible to Prison Abuse Due to Their Former Employment As Law Enforcement Officers

The defendants are not entitled to lesser sentences because they were law enforcement officers and, as they argue, are susceptible to abuse while incarcerated. The Guidelines require a six-level increase for someone acting under color of law, illustrative of Congressional intent that a defendant's status as a law-enforcement officer warrants an increase in the amount of punishment, not a decrease. U.S.S.G. 2H1.1(b)(1). The defendants have cited nothing that takes this case "outside the heartland" of other law enforcement misconduct cases to warrant a lesser sentence. See Guidelines Introduction, Policy Statement (4)(b).

The incarceration of former law enforcement officers is not extraordinary and—as the Supreme Court has held—is not a valid ground for a downward variance. As this Court has recognized, "in many instances, committing a crime while acting under color of law will result in a higher sentence . . . rather than a lower sentence." LaVallee, 439 F.3d at 708, see, e.g., United States v. Arroyo, 546 F.3d 54, 56-58 (1st Cir. 2008) (upholding upward departure for police officer); United States v. Van Matre, 524 F. App'x 307, 308-309 (8th Cir. 2013) (unpublished) (affirming denial of downward adjustment for police officer); United States v. Maybou, 379 F. App'x 489, 490-492 (6th Cir. 2010) (unpublished) (affirming upward variance for former sheriff's deputy/prison guard); United States v. Strange, 370 F. Supp. 2d 644, 649 (N.D. Ohio 2005) (rejecting downward departure for former deputy sheriff because his was "not an

exceptional case"). The defendants in this case have received no specific threats or notoriety that would render the standard Guidelines treatment of law-enforcement officers to be inappropriate here. We are hard-pressed to identify any case where a court granted (or upheld) a downward departure or variance for a former law enforcement officer on risk-of-abuse grounds without any record to support it, and defendants cite none. As the Supreme Court explained in affirming the variance denial in Rita: "The record makes out no special fear of retaliation, asserting only that the threat is one that any former law enforcement official might suffer." 551 U.S. at 359-360.

The BOP decides where and how to house any particular inmate and is capable of doing so in this case as well as any other. United States v. Spano, 476 F.3d 476, 479 (7th Cir. 2007); cf. United States v. Cabanillas, 318 F. App'x 610, 614 (10th Cir. 2008) (unpublished) (upholding variance denial for former cooperating gang member who feared retaliation, noting that such incarceration was "not uncommon" and expressing confidence that BOP would "take all steps necessary"). A downward variance on these grounds would not only negate the Guidelines, but constitute a per se statement that the BOP is incapable of protecting law-enforcement inmates.

D.  A Guidelines Sentence Ensures Uniformity on a National Level

Title 18 U.S.C. § 3553 calls for "the need to avoid unwarranted sentencing disparities among defendants." 18 U.S.C. 3553(a)(6). It specifically concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct. See United States v. Morgan, 2015 WL 6773933, at *22, *23 (10th Cir. 2015) (finding sentence unreasonable where district court failed to consider how it would satisfy need for "general deterrence" or need for sentence "to promote respect for the law and to provide just punishment for the offense"). As a matter of course, federal courts impose terms of imprisonment on law enforcement and corrections officers for violations of 18 U.S.C. 241 or 242—even on non-

10

supervisory officers—that are significantly longer than the sentences imposed here.  See, e.g., United States v. Wilson, 686 F.3d 868 (8th Cir. 2012) (120 months), cert. denied, 113 S. Ct. 873 (2013); United States v. McCoy, 480 F. App'x 366 (6th Cir. 2012) (unpublished) (120 months); United States v. Owens, 437 F. App'x 436 (6th Cir. 2011) (unpublished) (63 months); United States v. Carson, 560 F.3d 566 (6th Cir. 2009) (33 months); United States v. Lopresti, 340 F. App'x 30 (2d Cir. 2009) (unpublished) (51 months); United States v. Miller, 477 F.3d 644 (8th Cir. 2007) (78 months); LaVallee, 439 F.3d 670 (41 months and 30 months); United States v. Bailey, 405 F.3d 102 (1st Cir. 2005) (41 months).  Even the 21-month sentence given the defendant in United States v. Strange, 370 F. Supp. 2d 644 (N.D. Ohio 2005), exceeds the sentences imposed here, despite the district court's decision in that case to vary downward from the Guidelines range in part because in the jail in which the defendant worked, "punitive beatings were apparently condoned and even ordered by superior officers." Id. at 651.  The sentences that the court initially imposed on Barnes and Brown actually create disparities with defendants convicted of similar criminal cases.

This was also a key failing of the below-Guidelines sentences which were reversed in McQueen.  Recognizing that "[g]eneral deterrence . . .  is one of the key purposes of sentencing," the Eleventh Circuit ruled that these sorts of extremely light sentences "wholly fail to adequately deter criminal conduct."  727 F.3d at 1158 (citation omitted).  As the court explained, "[p]risoners are uniquely vulnerable to officials who control every aspect of their lives," yet "violent abuse by corrections officers against inmates may easily go undetected and unpunished." Ibid. (citation omitted).  Because "[t]he ability to unearth these crimes by law enforcement officers in a prison setting is particularly difficult, . . . the extraordinarily lenient sentences in this case sap the goal of general deterrence." Id. at 1158-1159.

11

Throughout their briefing in this case, Barnes and Brown have failed to identify a single case in which a court has imposed or upheld a term of incarceration for supervisory corrections officers found guilty of such serious civil rights offenses, including the physical abuse of inmates in their care and custody, as short as the prison terms imposed on these defendants. For the foregoing reasons, the United States respectfully requests the Court sentence the defendants to 70-87 months in prison.

## IV.   Custodial Status

In accordance with 18 U.S.C. § 3143, the defendants must be taken into custody after they are sentenced. Section 3143(b)(2) requires, with no exceptions, that a defendant who has been convicted of a crime of violence be detained pending appeal. During the initial sentencing hearing held at the conclusion of trial, this Court held that the convictions were crimes of violence. Trial Transcript, Vol. VI, p. 1135 ("I have found it is a crime of violence."). In so finding, this Court followed the dictates of the Tenth Circuit and other district courts in the circuit, which have found the same. See United States v. Verbickas, 75 Fed.Appx. 705 (10th Cir. 2003) (unpublished); United States v. Lavallee, 269 F. Supp. 2d 1297 (D. Colo. 2003). Accordingly, the Court lacks the discretion to allow these defendants to remain free on bond pending any potential appeal of their sentences.

Respectfully submitted:


VANITA GUPTA
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division


By: */s/ Dana Mulhauser*
FARA GOLD
Special Litigation Counsel
DANA MULHAUSER
Trial Attorney
U.S. Department of Justice
Civil Rights Division
601 D Street, NW
Washington, DC 20530
(202) 305-0007
Dana.Mulhauser@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the attorneys for the defendants.


/s/ *Dana Mulhauser*
Dana Mulhauser
Trial Attorney
U.S. Department of Justice
Civil Rights Division, Criminal Section